UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA DAVIS,

               Plaintiff,                CIVIL ACTION NO. 10-14137

        v.                          DISTRICT JUDGE DAVID M. LAWSON

COMMISSIONER OF               MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

    ***A.    Proceedings in this Court***

On October 15, 2010, Plaintiff Debra Davis ("Plaintiff") filed the instant suit seeking

judicial review of the Commissioner's decision disallowing benefits (Dkt. No. 1).  Pursuant to 28

U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned for

the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of

disability, Disability Insurance and Supplemental Security Income benefits (Dkt. No. 3).  This

matter is currently before the Court on cross-motions for summary judgment (Dkt. Nos. 13, 14).

Plaintiff also filed a response (Dkt. No. 15) to Defendant's motion for summary judgment.

    ***B.    Administrative Proceedings***

Plaintiff filed the instant claims on May 14, 2008, alleging that she became unable to

work on November 9, 2007, but amended her alleged onset date to March 21, 2007 at the

administrative hearing (Tr. 11, 98-102).  Plaintiff's claim was initially disapproved by the

Commissioner on July 22, 2008  (Tr. 11, 45-52).  Plaintiff requested a hearing and, on June 17,

2009, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) Laura Speck

Havens, who considered the case *de novo*.  In a decision dated October 30, 2009, the ALJ found

that Plaintiff was not disabled (Tr.  8-20).  Plaintiff requested a review of this decision on

December 30, 2009 (Tr. 6-7).  The ALJ's decision became the final decision of the

Commissioner on August 18, 2010 when, after the review of additional exhibits[1] (AC-16F-17F,

Tr. 4, 528-661), the Appeals Council denied Plaintiff's request for review (Tr. 1-5).

For the reasons set forth below, this Court finds that the reasons the ALJ gave for

discounting Plaintiff's credibility are not supported by substantial evidence and that the ALJ

erred by not considering the impact of Plaintiff's obesity on her impairments.  Accordingly, this

Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that

Defendant's Motion for Summary Judgment be **DENIED**, and that, pursuant to sentence four of

42 U.S.C. § 405(g), the decision of the Commissioner be **REMANDED**.

## II.   STATEMENT OF FACTS

### A.   *ALJ Findings*

Plaintiff was 42 years old on her alleged disability onset date (Tr. 18).  Plaintiff has past

relevant work as a real estate agent (Tr. 18).  The ALJ applied the five-step disability analysis to

Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful

activity since March 21, 2007 (Tr. 13).  At step two, the ALJ found that Plaintiff had the

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review.  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ.  In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

following "severe" impairments: depression and herniated nucleus pulposus status post microdiskectomy with pain in neck, shoulders, and chest (Tr. 13-14).  At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 14-15).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to perform "a wide range of light work....  Specifically, she can only sit for 6 hours, stand for 6 hours, and walk for 6 hours.  She should be given an option where she can sit and stand as needed. [Plaintiff] cannot lift and carry over 15 pounds occasionally and over 10 pounds frequently.  She is prohibited from forceful pushing or pulling. [Plaintiff] cannot drive or ride rough riding vehicles.  She can occasionally stoop and bend.  She cannot work in a work environment requiring more than a fair ability to maintain attention and concentration, a fair ability to understand, remember and carry out detailed job instructions, and a fair ability to respond to changes in the work setting" (Tr. 15).  At step four, the ALJ found that Plaintiff could perform her previous work as a real estate agent, as that work does not require performance of work-related activities precluded by Plaintiff's RFC (Tr. 18).  Thus, the ALJ denied Plaintiff's claim at step four.  However, the ALJ also proceeded to step five, in the alternative, and found that Plaintiff could perform a significant number of jobs available in the national economy, such as general office clerk (15,000 jobs available in Michigan), cashier (20,000 available jobs in Michigan) or storage rental clerk (3,000 jobs available in Michigan) (Tr. 19).

### B.    Administrative Record

#### 1.    Plaintiff's Testimony and Statements

Plaintiff testified at the administrative hearing that she became unable to work in March 2007 due to severe low back and abdominal pain (Tr. 26).  She had pain from her neck down to

-3-

her hips and the pain radiated down her leg (Tr. 31). Plaintiff also reported memory problems, which she attributed to depression (Tr. 32). Plaintiff testified that she sometimes cooked and washed dishes, could not mop or sweep, and that she did the laundry if her children carried the basket (Tr. 28). She also enjoyed attending church, although she could not always go (Tr. 29). Plaintiff stated that she could drive up to 30 minutes and slept 4 to 6 hours per night (Tr. 29); she could stand for 10 to 15 minutes, sit for 30 minutes, and lift about 5 to 10 pounds (Tr. 31).

## 2.    Medical Evidence

On October 6, 2006, Plaintiff first presented to Dr. Theresa Benevich with complaints of low back and abdominal pain (Tr. 304). Dr. Benevich noted that Plaintiff was an "obese woman," weighing 271 pounds (*Id.*) Dr. Benevich reviewed colonoscopy results from September 1, 2006, and ultimately diagnosed Plaintiff with infectious colitis, as well as asthma (*Id.*) Plaintiff was instructed to resume taking Advair (for her asthma) and Dr. Benevich was awaiting results from a colon biopsy before determining how to address Plaintiff's colitis.

On December 4, 2006, Plaintiff returned to Dr. Benevich. During this visit, Plaintiff complained of migraine headaches and continuing abdominal pain (Tr. 302). Dr. Benevich noted that Plaintiff had a prior medical history of asthma and depression (*Id.*). Plaintiff again complained of low back pain, and was referred to physical therapy (*Id.*). Dr. Benevich noted that Plaintiff was taking 400-600 mg of Ibuprofen for her back pain (*Id.*).

On December 19, 2006, Plaintiff presented to Dr. Corey Dean with complaints of left wrist pain (Tr. 301). Dr. Dean diagnosed Plaintiff with DeQuervain's tenosynovitis and wrist sprain, and proscribed Naprosyn (an anti-inflammatory/pain medication) (*Id.*). Dr. Dean also recommended ice treatment, and noted that a steroid injection might be required in Plaintiff's wrist if the Naprosyn did not reduce the inflammation (*Id.*).

-4-

On January 24, 2007, Plaintiff returned to Dr. Benevich, again complaining of low back and wrist pain (Tr. 299). Dr. Benevich noted that Plaintiff's back pain was "markedly improved" with physical therapy and NSAIDs (nonsteroidal anti-inflammatory drugs). Dr. Benevich noted that Plaintiff was "back to work driving a bus" (*Id.*).

On February 21, 2007, Plaintiff again presented to Dr. Dean, for follow-up concerning her left wrist pain (Tr. 298). Dr. Dean noted that Plaintiff was using Naprosyn and Motrin, which did not seem to help with her pain (*Id.*). Plaintiff informed Dr. Dean that she wanted to discuss an injection to help her wrist pain (*Id.*). Dr. Dean referred Plaintiff to physical therapy, and noted that he would consider administering an injection in 4-6 weeks if physical therapy did not improve Plaintiff's wrist pain (*Id.*). Dr. Dean also noted that "[a]n injection is a little bit riskier at this area because it is near the radial artery" and stated that he "does not like to inject here if I can avoid it" (*Id.*).

On March 21, 2007, Plaintiff again presented to Dr. Benevich with complaints of persistent abdominal and pelvic pain, ongoing since she was diagnosed with infectious colitis in October 2006 (Tr. 294). She reported increased pain since receiving an injection of Depo-Lupron (a drug used to induce short-term menopause) (Tr. 294). Dr. Benevich ordered an abdominal and pelvic CT scan (Tr. 294). Dr. Benevich noted that Plaintiff was taking Naprosyn and Vicodin for pain (Tr. 294).

Plaintiff returned to Dr. Benevich on March 27, 2007, and complained of low back pain in addition to pelvic pain, unrelieved with medication (Tr. 293). Dr. Benevich noted that the pelvic CT scan had been normal (Tr. 217, 293). Plaintiff was tender in the lower left quadrant of her abdomen (Tr. 293). She was prescribed Tramadol (pain medication) and Naprosyn (anti-inflammatory drug) and instructed to use Vicodin for breakout pain (Tr. 293).

-5-

On April 9, 2007, Plaintiff presented to Dr. Dean with complaints of bilateral wrist and knuckle pain (Tr. 292).  Plaintiff had point tenderness over the left wrist tendons along the dorsal aspect of the hand and the ventral aspect of the hand and wrist (Tr. 292).  She displayed mild point tenderness over the flexor pollicis longus and in the MCP joints (thumb joints), decreased ranges of motion, a positive Thomas test for thumb osteoarthritis, and CMC joint (a wrist joint) tenderness (Tr. 292).  Dr. Dean ordered physical therapy and wrist x-rays (Tr. 292).  Bilateral wrist x-rays were normal (Tr. 324).

Later in April 2007, Plaintiff presented to Dr. Larry Adler with complaints of abdominal pain, constipation, and diarrhea (Tr. 401).  He noted that he had performed diagnostic studies in October 2006 with abnormal findings including a thickened colon and colitis (Tr. 401).  Dr. Adler opined that her pain could be secondary to post-infectious irritable bowel syndrome, but could also represent musculoskeletal pain or endometriosis; he prescribed medication and recommended a repeat sigmoidoscopy (Tr. 401).  The sigmoidoscopy was normal (Tr. 170).

Between April and May 2007, Plaintiff received physical therapy six times for left wrist tendonitis (Tr. 393, 396).  Plaintiff also attended  therapy sessions for treatment of recurrent, moderate major depression with Lauren Ungar, LP (licensed psychologist), at Saint Joseph Mercy Behavioral Services (Saint Joseph) once a month between April and June 2007 (Tr. 513-15).

On May 8, 2007, Plaintiff presented to Dr. Jon Wardner with complaints of low back/pelvic pain caused by a wide range of activities (Tr. 390).  Dr. Wardner noted that Plaintiff had chronic low back pain and opined that sacroiliac dysfunction may have been a component to her complaints and that due to her history of depression/anxiety, there could also be a component of somatization (Tr. 391). Dr. Wardner ordered lumbosacral and sacroiliac x-rays, which

revealed L5-S1 disc space narrowing and a transitional lumbosacral segment (Tr. 322-23, 377, 391).

On May 9, 2007, Plaintiff presented to a pulmonary specialist for treatment of asthma and the specialist noted that Plaintiff was doing well from a pulmonary perspective (Tr. 343).  On May 11, 2007, Dr. Benevich examined Plaintiff due to her complaints of chronic pelvic pain. The recommendation was that Plaintiff follow-up with Drs. Wardner and Adler.  If the pain persisted and no etiology of her pain was found, Plaintiff was to schedule an exploratory laparoscopy (Tr. 291).  Dr. Benevich also referred Plaintiff for physical therapy for her right hand (Tr. 291).

On May 25, 2007, Dr. Dean opined that Plaintiff's symptoms were due to DeQuervain's tenosynovitis caused by overuse (Tr. 290).  Plaintiff had "[m]ild point tenderness over the flexor digitorum profundus near the wrist near the radial bone" and mild tenderness of the tendons over the ulnar aspect of the wrist and over the base of the thumb at the CMC joint (Tr. 290).  Dr. Dean recommended continuing physical therapy, using wrist splints, and taking pain control medications (Tr. 290).

Between May and June, 2007, Plaintiff received physical therapy for right hand pain seven times (Tr. 388).  Plaintiff reported no significant improvement for either hand (Tr. 388).  In June 2007, Plaintiff presented to Dr. Benevich with continuing lower left quadrant pain (Tr. 288). Plaintiff had limited hip rotation due to pain and left hip pain with pressure.  Dr. Benevich noted that Plaintiff was scheduled for an exploratory laparoscopy and ordered bilateral hip x-rays due to possible degenerative changes (Tr. 288).  The pelvis and hip x-rays taken June 5, 2007, were normal (Tr. 321).  A laparoscopy was performed on June 20, 2007, at St. Joseph Mercy Health System.  The postoperative diagnosis was significant pelvic congestion in both sides of her

uterus.  It was noted that Plaintiff was possibly going to need a hysterectomy if she continued to have pain (Tr. 167-69).

Plaintiff presented to Dr. Patricia McNally on November 19, 2007, with complaints of worsening low back pain radiating to the sides and down her left leg (Tr. 283).  Plaintiff's exam revealed diffuse lumbar spine tenderness, decreased left hip flexion strength, a positive straight leg raise and normal gait (Tr. 283).  Dr. McNally recommended continuing physical therapy, prescribed Vicodin for pain, referred Plaintiff to a pain clinic, and ordered a lumbar spine MRI (Tr. 283).  She provided a note stating that Plaintiff could not work for four weeks; the note was later renewed until February 2008 (Tr. 151-52).  Physical therapy notes from November 15, 2007 through December 14, 2007 reported a 50% improvement in Plaintiff's overall symptoms (Tr. 379, 386).  Plaintiff also met with Ms. Ungar twice in November, 2007, for therapy and discussed her physical conditions, childhood, and family problems (Tr. 506-07).

Plaintiff underwent a total abdominal hysterectomy on August 2, 2007, for an enlarged retroverted uterus (Tr. 179-180).  On December 17, 2007, Plaintiff returned to Dr. Wardner for a follow-up visit regarding her low back pain.  (Tr. 377). Dr. Wardner indicated that she recently had an L4-5 epidural steroid injection and was scheduled for a second injection (Tr. 377).  Dr. Wardner noted that a recent lumbar spine MRI (Tr. 319-20) showed a moderate right L3-4 disc protrusion with moderate-severe right L3-4 foraminal stenosis; a disc bulging/protruding to the left at L4-5; moderate-severe left L4-5 foraminal stenosis; and milder degenerative changes seen at other levels (Tr. 377).  Dr. Wardner recommended continuing her treatment regimen and use of NSAIDs (Tr. 377).  Plaintiff saw Dr. Gabriel on December 7, 2007, and reported that Prozac had been effective.  He added attention deficit hyperactivity disorder (ADHD) to her diagnoses (Tr. 505).

Later that month, on December 14, 2007, Plaintiff reported to Dr. McNally that her back pain was much better but that she still did have some pain; she used Vicodin and Valium very sparingly (Tr. 282). The second epidural steroid injection was administered five days later (Tr. 354).

Between January and March 2008, Plaintiff met with Dr. Gabriel once and Ms. Ungar three times and discussed her family problems (Tr. 500-03). Dr. Gabriel increased her dosage of Prozac and prescribed Valium (Tr. 503).

On January 7, 2008, Plaintiff presented to Dr. D'Anna Saul with complaints of neck and face swelling, palpitations, and lower extremity cramping (Tr. 279). Plaintiff had mild cheek swelling, anterior neck fullness with some thyromegaly palpated on examination, a regular heart rate with three irregular beats, and lower extremity edema and mild tenderness. Dr. Saul ordered laboratory tests (Tr. 279). Plaintiff returned for a follow-up appointment on January 16, 2008, and complained of left chest discomfort for two days with associated left shoulder aching (Tr. 277). She also complained of continuing palpitations; worsening back pain with associated leg cramping; depression, possibly contributing to pain; and facial and neck swelling (Tr. 277). Plaintiff had a "low" affect, substernal and left shoulder anterior chest pain, and lower leg edema (Tr. 277). Dr. Saul opined that her chest pain was musculoskeletal and recommended use of NSAIDs, a stress test, and initiation of an event monitor for her palpitations (Tr. 278).

At the end of January 2008, Plaintiff presented to Dr. Geoffrey Thomas for treatment of her chronic low back pain and a six-month history of buttock and thigh pain occurring during a wide variety of activities (Tr. 374). She stated that various therapies and techniques to relieve her pain were only minimally effective and that she could only walk around her house with difficulty (Tr. 374). On examination, Plaintiff often changed positions while seated, had

difficulty rising from a chair and standing, had a loss of lordosis, and walked with an antalgic

gait (Tr. 374-75). Dr. Thomas noted that Plaintiff was 5'10" tall, and weighed 270 pounds (Tr.

160). Plaintiff displayed a very limited range of motion, bilateral positive straight leg raising

tests, and slightly decreased left thigh sensation (Tr. 375). She had full and pain free ranges of

motion in her hips, knees, and ankles (Tr. 375). After reviewing diagnostic studies, Dr. Thomas

diagnosed degenerative lumbar spine changes and acute L3-4 herniated disc causing the most

predominant symptoms (Tr. 375). He recommended a lumbar discectomy at L3-4, which was

performed by Dr. Thomas on February 19, 2008 (Tr. 163, 375). Plaintiff was discharged from

the hospital on February 20, 2008 (Tr. 157) and instructed not to do any bending or twisting or

her spine, not to lift more than 3-5 pounds of weight and to ice her back 4 times per day for

"several weeks" (*Id.*)

   In March 2008, Plaintiff presented to Dr. Wardner and reported that her pain symptoms

had improved following her discectomy (Tr. 371). Plaintiff exhibited slow, independent

transfers, walked with a cane, and had a diminished right quadriceps reflexes. Plaintiff requested

an extension to her temporary disability which was expiring soon. Dr. Wardner stated that he did

not know if she would need long-term disability (Tr. 371). He stated that she should be able to

work in some capacity and that he anticipated a slower than average recovery because of her

medical history (Tr. 371). He wrote a note indicating that she could not perform her regular

work, which he renewed in April 2008 (Tr. 249-50).

   In April 2, 2008, Dr. Thomas examined Plaintiff following her microdiskectomy six week

earlier. The doctor noted that she was improving, although slowly, and referred her for physical

therapy (Tr. 232). At the end of the month, Plaintiff presented to Dr. Sara Smith with complaints

of right neck pain and problems with her hands, including left hand tendonitis and right elbow

-10-

pain (Tr. 272-273). Plaintiff had pain on right neck turning and very tight neck and upper shoulder muscles on the right with pain (Tr. 272). Dr. Smith opined that her symptoms were due to physical therapy and recommended Valium. Plaintiff stated that she had a follow up appointment scheduled with Dr. Wardner (Tr. 272).

Plaintiff presented to Dr. Wardner on April 30, 2008, and reported that her low back pain was improved, but that she had neck and right shoulder pain and bilateral hand discomfort with weakness and occasional numbness (Tr. 363). Plaintiff displayed pain behaviors, had a guarded range of cervical motion, and her transfers, gait, and balance were normal (Tr. 363). Plaintiff displayed diffuse right shoulder tenderness, guarding against range of motion testing, and some mild hand weakness (Tr. 363). Dr. Wardner stated that he thought it would be possible that she could return to work as a bus driver, but that he suspected that she would have ongoing problems because of her chronic diffuse/regional symptoms. Dr. Wardner ordered right shoulder and cervical spine x-rays which were taken the same day (Tr. 363). The right shoulder x-ray was normal and the cervical spine x-ray showed a straightened cervical lordosis that was interpreted as possibly positional or due to acute muscle spasms (Tr. 317-18).

Plaintiff met with Ms. Ungar five times in April and May 2008 for therapy sessions and discussed her chronic concerns (Tr. 495-99). In May 2008, Dr. Gabriel discontinued Prozac and prescribed Cymbalta, which he increased in September, 2008 (Tr. 493-94). Plaintiff returned to Dr. Wardner on May 29, 2008, and told him that she was applying for disability (Tr. 251). He stated that she was temporarily disabled from her regular job, but he did not know whether she would be found disabled from all work (Tr. 251).

In June 2008, Plaintiff presented to Dr. Anne Maliszewski for treatment of chest pain and pain and tenderness in her fingers, wrist, and legs (Tr. 448). Plaintiff had reproducible decreased

-11-

grip strength, left chest pain, and some indication of biatrial enlargement on an EKG study (Tr. 448).  Dr. Maliszewski diagnosed joint pain and possible tenosynovitis and recommended physical therapy for 2-3 weeks and more frequent use of Motrin up to three times per day (Tr. 448).

In July 2008, Leonard Balunas, Ph.D., reviewed Plaintiff's records for the state DDS and created an assessment of her mental limitations (Tr. 408-25).  Dr. Balunas opined that Plaintiff had ADHD and a depressive syndrome resulting in a moderate limitation in maintaining concentration, persistence, or pace and mild limitations in activities of daily living and maintaining social functioning (Tr. 409, 411, 418).  Dr. Balunas further opined that Plaintiff was able to perform unskilled work involving one and two step instructions with a limited need for sustained concentration and only occasional changes in the work setting (Tr. 424).

In September 2008, Dr. Leela Suruli performed a consultative examination of Plaintiff due to complaints of right lower-to-mid back pain (Tr. 452).  Dr. Suruli recommended a pelvic MRI to rule out an adnexal mass (mass in the adnexa of the uterus, meaning the ovary or fallopian tube) and a laboratory test to rule out ovarian cancer (Tr. 451).  The MRI revealed a right ovarian cyst and moderate free fluid in the pelvis (Tr. 468).

In December 2008, Dr. Paul Olejniczak performed a disability retirement evaluation of Plaintiff for her employer (Tr. 523-27).  Plaintiff walked slowly with a cane and had discomfort with forward flexion, minimal paraspinal tenderness, and pain on bilateral straight leg raising (Tr. 526).  Dr. Olejniczak opined that Plaintiff was disabled from her position as a bus driver and that due to her lumbar spine condition she was limited to: occasionally lifting 10-15 pounds; no repetitive bending or twisting; no forceful pushing or pulling; must be permitted to sit or stand at will; and no driving rough riding vehicles (Tr. 527).

-12-

Between December 2008 and January 2009, Plaintiff presented to Dr. Amy Brode for treatment of microhematuria (blood in the urine) and dysuria (pain or difficulty urinating) on three occasions (Tr. 479-81).  Dr. Brode ordered studies including a CT scan of Plaintiff's abdomen and pelvis, urine tests, and a cystoscopy with bladder biopsy (Tr. 479-81).

In January 2009, Dr. Brode diagnosed chronic bladder inflammation and prescribed medication (Tr. 480).  In March 2009, Plaintiff presented to Dr. Brode for a follow-up visit concerning suprapubic pressure and cystitis (bladder inflammation); Dr. Brode continued her medication (Tr. 482).

In May 2009, Dr. Gabriel wrote a letter in response to an inquiry from Plaintiff's attorney and opined that he did not consider Plaintiff disabled due to her psychiatric condition (Tr. 492). He stated that she had a mood disorder most likely exacerbated, if not caused by her physical conditions (Tr. 492).  Dr. Gabriel stated that he could not recall and had no written record of any symptoms that  would indicate that she could not work due to a psychiatric illness (Tr. 492).

The administrative record also contains a large number of treatment records that were not before the ALJ, but were rather submitted by Plaintiff for the first time to the Appeals Counsel, who referred to the material as Exhibits 16F and 17F (Tr. 4) (the records themselves appear at Tr. 528-661).  These records consist of documents from Oakwood Anapolis Hospital (from September 9, 2009 – November 2, 2009), and documents from Providence Hospital (from November 2, 2009 – November 17, 2009).  The Oakwood records document visits to the emergency room by Plaintiff to treat chest pain and depression; these documents also list the numerous medications Plaintiff was then taking.  The Providence records also document visits by Plaintiff to the emergency room, this time to treat severe lip swelling, depression and suicidal

-13-

ideation.  The Providence records also document a neck surgery (Tr. 628-630) performed on November 6, 2009 by Dr. Ryan Barrett.

### 3.      Vocational Expert

The ALJ asked the vocational expert (VE) a hypothetical question regarding what work could be performed by a person with Plaintiff's vocational profile who could sit for 6 hours and stand or walk for 6 hours, lift and carry 15 pounds occasionally and 10 pounds frequently and had further limitations including: must be permitted a sit/stand option; no forceful pushing or pulling; no driving rough riding vehicles; and only occasional stooping and bending (Tr. 37). The ALJ added that the person had a fair ability to: maintain attention and concentration; understand, remember, and carry out complex and detailed job instructions; and respond to changes in a work setting (Tr. 37-38). The ALJ defined "fair" as meaning a limited, but satisfactory ability (Tr. 38). The VE testified that such a person could perform Plaintiff's past work as a real estate agent (Tr. 38).

### C.      Plaintiff's Claims of Error

This Court is to liberally construe this *pro se* Plaintiff's Complaint and motion for summary judgment.  *See Erickson v. Pardus*, 551 U.S. 89 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  The undersigned has therefore reviewed the entire record, with the understanding that Plaintiff challenges the ALJ's decision as being unsupported by substantial evidence.

## III.     DISCUSSION

### A.      Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination

for exceeding statutory authority or for being arbitrary and capricious.  *See Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *See Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree

-15-

is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.").  "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'"  *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts."  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only.  *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight.  *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  There is no requirement, however, that either the ALJ or the reviewing court

-16-

must discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B.    Governing Law

The "[c]laimant bears the burden of proving her entitlement to benefits."  *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

-18-

### C.    Analysis and Conclusions

I find that the ALJ's decision contains errors of law, thus I recommend that this matter be remanded for a new hearing.  Specifically, I find that the ALJ erred in the following ways:

### 1.    The ALJ Erred in Evaluating Plaintiff's Credibility

An ALJ has a duty to provide a rational, non-conclusory explanation for her credibility analysis.  In particular, Social Security Ruling ("S.S.R.") 96-7p provides, in pertinent part,

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 WL 374186, at *2; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005) ("Regardless of whether harmless error can excuse inadequate articulation of credibility decisions, the strong statement from [S.S.R. 96-7p] constitutes a clear directive to pay as much attention to giving reasons for discounting claimant credibility as must be given to reasons for not fully accepting the opinions of treating sources.").[2]

S.S.R. 96-7p's explanatory requirement does not require an ALJ to explicitly discuss each of the credibility-weighing factors identified in 20 C.F.R. § 404.1529(c)(3).  *See Bowman v. Chater*, 132 F.3d 32 (table), 1997 WL 764419, at *4 (6th Cir. 1997) ("While this court applied

---

[2]   SSRs "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency.  20 C.F.R. § 402.35(b)(1); *see also Evans v. Comm'r of Soc. Sec.*, 320 F. App'x 593, 596, 2009 WL 784273, at *2 (9th Cir. Mar. 25, 2009) ("'Federal statutes, administrative regulations and Social Security Rulings together form a comprehensive scheme of legal standards that ALJs must follow in determining whether a claimant is entitled to disability benefits.'" (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990)).

each of [the § 404.1529(c)(3)] factors in [*Felisky v. Bowen*, 35 F.3d 1027, 1039-1040 (6th Cir.

1994)] we did not mandate that the ALJ undergo such an extensive analysis in every decision.").

And, this Court is well aware of the deference owed an ALJ's credibility determinations.[3]  But,

as the Sixth Circuit has explained,

> [Under Social Security Ruling 96-7p,] blanket assertions that the
> claimant is not believable will not pass muster, *nor will*
> *explanations as to credibility which are not consistent with the*
> *entire record and the weight of the relevant evidence*. . . . [W]hile
> credibility determinations regarding subjective complaints rest with
> the ALJ, those determinations must be reasonable and supported by
> substantial evidence.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007) (emphasis added); *see also*

*Bolden v. Comm'r of Soc. Sec.*, No. 03-cv-74136, 2005 WL 1871121, at *8 (E.D. Mich. Aug. 8,

2005) *report adopted by Bolden*, No. 03-cv-74136 (E.D. Mich. July 13, 2005) (explaining that

under S.S.R. 96-7p, "the ALJ's decision must be based on specific reasons for the findings of

credibility.  *These reasons must be supported by substantial evidence in the record*." (emphasis

added)).

        In this case, the Court cannot say that the reasons the ALJ gave for discounting Plaintiff's

testimony are supported by substantial evidence.  In evaluating Plaintiff's credibility, aside from

using standardized language (*see* Tr. 16), the ALJ provided:

> Though [Plaintiff] alleges pain over various parts of her body
> including her hands, joints, chest, shoulders, neck and lower back,
> even at levels 7 and 9 on a 10 points scale, medical records show
> that she has not sought out regular treatment, neglected pain
> medications, and even is hesitant to take new pain medications

---

        [3]  Heightened deference to an ALJ's credibility determination is based on the general rule that ALJ factual
findings are reviewed for substantial evidence and the more specific rationale that the ALJ is able to evaluate a
testifying witness's demeanor while this Court cannot.  But the Court does not understand this deference to mean that
the ALJ need not provide reasons for discounting a Plaintiff's credibility that are supported by substantial evidence –
indeed, this would render much of S.S.R. 96-7p surplusage.  Rather,  special deference is owed to the ALJ's
credibility determination when the ALJ follows the correct process for reaching that determination.

> (Exhibits 5F/4; 13F4,8,10).  This suggests that not all of
> [Plaintiff's] allegations are supported by the medical evidence.

(Tr. 138.)  Essentially then, the ALJ gave two justifications for discounting Plaintiff's credibility: failure to seek out regular medical treatment, and failure to regularly use pain medications.  Each is problematic.

First, quite contrary to the conclusion that Plaintiff "has not sought out regular treatment," Plaintiff's medical records actually show several years of frequent medical treatment concerning a variety of ailments.  Indeed, Plaintiff sought regular treatment from Dr. Wardner of Associates in Physical Medicine & Rehabilitation – a medical practice devoted to the treatment of chronic and severe pain.[4]  Plaintiff also sought regular and ongoing treatment from her primary care physicians (Drs. Benevich & Dean), regular physical therapy sessions and was referred to a spinal surgeon, who performed surgery.  Quite simply, the record does not support the conclusion that Plaintiff "has not sought out regular treatment" and the ALJ erred by discounting Plaintiff credibility on this basis.

Second, the ALJ's conclusion that Plaintiff "neglected pain medications, and even is hesitant to take new pain medications" is also belied by the medical evidence.  Plaintiff's medical records show that she took a variety of pain medications – including NSAIDs, Tramadol, Naprosyn, epidural steroid injections, Vicodin, and Valium – to combat her severe pain.  The ALJ cited various pages from the transcript (5F4; 13F4, 8, 10) in support of her conclusion that Plaintiff avoided pain medications, but the ALJ did not quote any language from those documents.  The undersigned has reviewed the transcript pages the ALJ appears to be referring to

---

[4] *See* http://www.apmandr.com/who-we-are/

(Tr. 251, 442-444, 447) – these documents do not support the ALJ's conclusion that Plaintiff somehow neglected or avoided taking pain medications.

The first document (Tr. 251) is a May 29, 2008 memorandum by Dr. Wardner.  The only portion of this memo discussing prescription medication is a line stating that Plaintiff's "only current medication is Valium, which was initially prescribed in the emergency department in 11/07" (*Id.*)  This isolated statement, however, does not support the broader conclusion that Plaintiff is somehow neglecting or avoiding pain medications altogether, particularly when contrasted to Plaintiff's entire medical records, which document long and continued use of a variety of pain medications.

The other documents cited by the ALJ (Tr. 442-444, 447) consist of reports by Dr. Patricia McNally documenting January 15, 2008 and May 30, 2008 office visits.  As to the January 2008 visit, the only reference to pain medication is that Plaintiff "did not use any NSAIDs or Tylenol for pain relief" (Tr. 442).   However, this statement was made in reference to chest pain experienced by Plaintiff.  This statement, taken in proper context, does not support the conclusion that Plaintiff avoided pain medications altogether.  Rather, it is much more likely that this statement reflects that Plaintiff did not treat her *chest pain* with pain medications.  Finally, as to the May 30, 2008 office visit, the only reference to pain medication is that Plaintiff "has had significant pain issues but she has never ever shown signs of inappropriate narcotic use" (Tr. 447).  This statement certainly does not support the ALJ's conclusion that Plaintiff somehow avoided or neglected pain medication – quite the contrary, this statement seems to indicate that Plaintiff suffered from severe pain, and that she has appropriately used heavy-duty, "narcotic" pain medications to treat her pain.

-22-

Given the foregoing, remand is required for the ALJ to reevaluate Plaintiff's credibility and, if it is to again be discounted, to provide good reasons for doing so.

### 2.      The ALJ Failed To Discuss The Effects Of Plaintiff's Weight

The ALJ also did not perform an individualized assessment of the impact of Plaintiff's obesity.  Although obesity was deleted from the Listing of Impairments in 20 C.F.R., subpart P, Appendix 1, the Commissioner should still address the issue:

> [E]ven though we deleted listing 9.09, we made some changes to the listings to ensure that obesity is still addressed in our listings. In the final rule, we added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems. See listings sections 1.00Q, 3.00I, and 4.00F. The paragraphs state that we consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.
>
> SSR 02-01p.

The medical records are replete with references to Plaintiff's obesity – Plaintiff was 5'10" and weighed between 270 and 280 pounds[5] during the time-period at issue.  However, the ALJ did not mention SSR 02-01p in her decision or give any meaningful discussion of the effect of Plaintiff's obesity, as required by SSR 02-01p.  The ALJ should have addressed the manner in which Plaintiff's weight affected her ability to work.

---

[5]  These measurements suggest that Plaintiff has a body mass index (BMI) between 38.7 and 40.2.  *See* http://www.nhlbisupport.com/bmi/  A BMI over 30 indicates that a person is "obese."  *See id.*

Accordingly, the undersigned recommends that this matter be remanded pursuant to sentence four of 42 U.S.C. § 405(g) to re-evaluate the impact of Plaintiff's obesity.  *See* SSR 02-1p, 2000 WL 628049, at *6; *see also, Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009) (explaining that while "Social Security Ruling 02-01p does not mandate a particular mode of analysis" regarding obesity, it "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation."); *Besecker v. Astrue*, No. 3:07CV0310, 2008 WL 4000911, at *5-6 (S.D. Ohio Aug. 29, 2008) ("The *repeated references* to Plaintiff's obesity in the record, including the opinions of several medical sources, should have alerted the ALJ to consider Plaintiff's obesity and its combined impact with his other impairments at Steps 2, 3 and 4 of the sequential evaluation") (emphasis added).

### 3.    On Remand, The ALJ Should Consider The Additional Medical Records Produced By Plaintiff To The Appeals Council

As noted earlier, Plaintiff produced voluminous additional medical records to the Appeals Council (Tr. 528-661).  Although Plaintiff, *pro se*, does not specifically request a "sentence six" remand[6] to reopen the record and have the ALJ consider these records, since, as discussed above, the ALJ's decision contains errors of law, the ALJ should on remand consider the additional medical evidence produced by Plaintiff to the Appeals Council.  Indeed, in *Faucher v. Secy of Health and Human Servs.*, 17 F.3d 171 (6th Cir. 1994), the Sixth Circuit held that a court may

---

[6]   "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).  The only exception to this prohibition is that the Court may remand a case and "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding" 42 U.S.C. § 405(g) (referred to as a "Sentence Six" remand).  To meet the standard for a sentence six remand, it must be shown that the evidence is both new and material and that good cause exists for the failure to include such evidence into the record in the prior proceeding.  *See Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006).

-24-

order the review of additional evidence on a sentence four remand. *Id.* at 175. In *Faucher*, the plaintiff requested a remand under both sentence four and sentence six. *Id.* at 172–73. The district court found that the plaintiff had not met the requirements of a sentence six remand, but awarded benefits based on the plaintiff's sentence four request. *Id.* at 173. On appeal, the Sixth Circuit reversed and remanded for proceedings under sentence four. *Id.* at 176. In doing so, the Court held that the ALJ could consider the additional evidence, even though the plaintiff had not met the requirements for a sentence six remand. *Id.* at 175. The Court reasoned as follows:

> [R]emands under both sentence four and sentence six of 405(g) can involve the taking of additional evidence. Under sentence six, a district court, before making a final judgment, may order the Secretary to consider additional evidence because a party presents material evidence to the court that was not previously available. Under sentence four, the court makes a final judgment, affirming, reversing, or modifying the Secretary's decision and *may order the Secretary to consider additional evidence on remand to remedy a defect in the original proceedings*, a defect which caused the Secretary's misapplication of the regulations in the first place.

*Id.* at 175 (emphasis added).

The undersigned is recommending remand in light of the ALJ's failure to properly evaluate Plaintiff's credibility and failure to discuss the impact of Plaintiff's weight on her impairments. As to the ALJ's credibility analysis, the undersigned finds that the ALJ's reasons for discounting Plaintiff's testimony (*i.e.*, that Plaintiff did not seek out regular medical treatment, and avoided/neglected pain medications) were not supported by the record. The ALJ's credibility analysis on remand would seem to be aided – without significant additional burden – by considering the medical records that Plaintiff provided to the Appeals Council, which further document Plaintiff's regular medical treatment and use of pain medications. Therefore, this Court recommends that, upon remand, the ALJ consider the additional evidence submitted to the Appeals Council (Tr. 528-661).

-25-

III.    RECOMMENDATION

Based on the foregoing, this Court finds that the reasons the ALJ gave for discounting Plaintiff's credibility are not supported by substantial evidence and that the ALJ erred by not considering the impact of Plaintiff's obesity on her ability to work.  Accordingly, this Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, that Defendant's motion for summary judgment be **DENIED**, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this matter be **REMANDED** for a new hearing consistent with the discussion above.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address

each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon                                    
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated:  December 30, 2011

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date,*
*December 30, 2011, by electronic and/or first class U.S. mail.*

*s/Melody R. Miles*                           
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*